## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| Lowell Scott Weil, DPM, and Weil Foot and Ankle Institute, LLC, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. |
| Bayer AG, Bayer HealthCare, LLC, Bayer Consumer Care, LLC, Merck & Co., Inc., and MSD Consumer Care, Inc., | ) ) ) ) | |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Lowell Scott Weil, DPM and plaintiff Weil Foot and Ankle Institute, LLC, on behalf of themselves and on behalf of all others similarly situated, states as their Class Action Complaint against defendants Bayer AG, Bayer HealthCare LLC, Bayer Consumer Care, LLC, Merck & Co., Inc. and MSD Consumer Care, Inc. as follows:

### NATURE OF THE ACTION

1.      Countless Americans, including numerous older Americans, suffer from podiatric conditions which warrant or require the use of "custom fit orthotic" – devices made pursuant to prescriptions based on the actual physical examination and evaluation of a particular patient and their feet.

2.      Plaintiffs, which include licensed podiatrists authorized to prescribe and dispense "custom fit orthotics," bring this class action lawsuit on behalf of themselves and others similarly situated, to redress defendants' continuous and extensive marketing

campaign falsely advertising their product, Dr. Scholl's "Custom Fit Orthotics," which they are not. Defendants' product advertising is targeted at unsuspecting consumers, mostly elderly, who are in need of medical evaluation and treatment for foot, ankle and related ailments, but who are being sold a product that provides little or no medical benefit, and is nothing more than an over-the-counter foot support being falsely marketed as a "custom fit orthotic."

3.     Defendants' conduct constitutes a direct violation of the prohibition against false advertising under the Lanham Act (15 USC §1051, et seq.).

4.     As addressed below, "custom fit orthotics" are corrective devices, made under a prescription provided by a licensed podiatrist, based on a medical evaluation of the actual lower extremity and physical examination and evaluation of an individual and their feet.

5.     To be a "custom fit orthotic," there must be an actual examination and assessment of the individual and both of their feet, and an orthotic device manufactured and tailored to the unique characteristics of the individual and their feet.

6.     This class action lawsuit arises out of the defendants' developing, manufacturing, packaging, promoting, marketing, distributing, labeling, and/or selling a product, known Dr. Scholl's Custom Fit Orthotic Inserts (the "Product"), which is, by its very name purported to be a "custom fit orthotic" device, which it is not.

7.     This designation of its product is knowingly false, in violation of Section 43 of the Lanham Act (15 USC § 1125).

8.     Defendants' willful and deliberate representations that its Product is a "custom fit orthotic" are literally false.

9.     Defendants have implemented this false advertising and marketing campaign through numerous means of communication including the labeling on the package in which the Product is sold, widely-broadcast television commercials, internet advertising and "point-of-purchase" and other retail-level advertising.

10.    Defendants have promoted and continue to falsely promote the Product, even though the designations are knowingly false and misleading. Defendants recent advertising has become so outrageous and misleading that they claim now that their "custom fit orthotic inserts" are "uniquely designed to provide immediate all day relief from lower back pain."

11.    Plaintiffs and the class members are licensed and authorized to prescribe and dispense actual custom-fit orthotic devices, fabricated in an orthotic laboratory that fills prescriptions from licensed podiatrists, and have suffered and will continue to suffer from defendants' false advertising of the Product.

12.    Defendants' false advertising is injurious to plaintiffs and the class members, who have undergone extensive medical training and obtained required licensure or certifications to prescribe "orthotics," based on an examination and the actual physical assessment and evaluation of an individual and their feet, providing an actual "custom fit" orthotic specifically crafted for the individual's foot or feet.

13.    The false advertising is also injurious to plaintiffs and the class members because consumers have bought, and continue to buy defendants' products, rather

3

than their competing products, which are actual custom fit orthotic devices.

14.     This has resulted in defendants wrongfully earning millions of dollars in profits to the detriment of plaintiffs and the class members, who have lost and continue to lose significant sales of their competing products and suffer deterioration of the goodwill associated with their products.

15.     Plaintiffs and the class members are entitled to a judgment finding that defendants are liable for false advertising under the Lanham Act and are entitled to permanent injunctive relief, including an order directing defendants to discontinue the false advertising and promotion of the product as a "custom fit orthotic," and requiring defendants to engage in corrective advertising to alleviate the deception caused in the market by its massive false advertising campaign.

16.     Plaintiffs and the class members are also entitled to an award of substantial damages under the Lanham Act, including punitive damages and reasonable attorneys' fees.

### THE PARTIES

17.     Plaintiff Dr. Lowell Weil, DPM ("Dr. Weil") is a resident of the State of Illinois, residing in this District.

18.     Dr. Weil is, and has been, a Doctor of Podiatric Medicine, licensed by the State of Illinois for fifty years. Dr. Weil is, and has been, licensed and authorized to take a history of a patients foot complaints, examine the patient's feet and ankles, and make a decision whether that individual needs a prescription for custom orthotics.

19.     Plaintiff Weil Foot and Ankle Institute, LLC ("WFAI") is an Illinois limited liability company with its principal place of business in Des Plaines, Illinois.

20.     WFAI employs approximately twenty-four podiatrists, including Dr. Weil, all of whom are, and have been, Doctors of Podiatric Medicine, licensed by the State of Illinois.

21.     All podiatrists at WFAI are, and have been, licensed and authorized to prescribe custom fit orthotics.

22.     Defendant Bayer AG is a German stock company that claims to be a life sciences and healthcare company, but which acquired the Dr. Scholl's foot care and other consumer product businesses from defendant Merck & Co., Inc. in 2014.

23.     Defendants Bayer HealthCare, LLC and Bayer Consumer Care, LLC are Delaware limited liability companies operated in the United States as indirect subsidiaries of Bayer AG which, on information and belief, manufacture, advertise, market, promote, sell and distribute Dr. Scholl's "Custom Fit Orthotics" throughout the United States.

24.     Defendant Merck & Co., Inc. ("Merck") is a New Jersey corporation with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey.

25.     Defendant MSD Consumer Care, Inc. ("MSD") is a Delaware corporation, formerly known as Schering-Plough Healthcare Products, Inc., and is or was a wholly owned direct or indirect subsidiary of Merck.

26.  Prior to October of 2014, defendant Merck and MSD manufactured, advertised, marketed, promoted, sold and distributed Dr. Scholl's "Custom Fit Orthotics" throughout the United States.

27.  Defendants transacted and conducted business within the State of Illinois, including the advertising, promotion, sale and distribution of Dr. Scholl's products in this District, and have derived substantial revenue from the sale of Dr. Scholl's Custom Fit Orthotics in the State of Illinois.

## VENUE AND JURISDICTION

28.  This action arises under Section 43(a) of the Lanham Act, 15 USC § 1125(a), with original jurisdiction vested in this Court under 15 USC § 1121 and 28 USC § 1331.

29.  Venue is proper in this district under 28 USC § 1391(b)(1)and (2) because defendants conduct business in the Northern District of Illinois and are subject to personal jurisdiction here, and the events giving rise to this cause of action occurred in the Northern District of Illinois.

## STATEMENT OF FACTS

### PODIATRY AND PLAINTIFFS' PRACTICE

30.  Podiatrists are physicians who focus exclusively on the foot and ankle, and are uniquely qualified to diagnose and treat foot-related problems.

31.  Podiatrists are qualified by their education, training, and experience to diagnose conditions of the foot, ankle, and leg structures and to treat patients with such medical problems.

32.     The medical education and training of a podiatrist includes four years of undergraduate education, four years of graduate education at an accredited podiatric medical college, and three years of hospital residency training.

33.     All fifty states require podiatric physicians to be licensed.

34.     As explained by the American Association Of Colleges Of Podiatric Medicine:

> Podiatric physicians are licensed in all 50 states, the District of Columbia and Puerto Rico to treat the foot and its related or governing structures by medical, surgical or other means. State licensing requirements include graduation from one of the nine accredited schools and colleges of podiatric medicine, passage of the National Board exams, postgraduate training and written and oral examinations. National Boards are taken in two parts while in podiatric medical school. Part I covers basic science areas and is taken at the conclusion of the second year. Part II covers clinical areas and is taken in the spring of the fourth year, prior to graduation.

http://www.aacpm.org/html/careerzone/cz3_faqs.asp

35.     Dr. Lowell Scott Weil conducts his podiatric medicine and surgery practice in Des Plaines, Illinois.

36.     His practice, which operates through the entity WFAI, includes seventeen podiatric physicians providing foot and ankle services at twenty locations.

37.     Services provided at the WFAI include reconstructive foot and ankle surgery, diabetic wound care, pediatric foot disorders, sports medicine, and general foot care.

38.     Recognized as an international leader in podiatric medicine and surgery, the doctors at WFAI have provided care and treatment to over 100,000 patients since 1965.

39.     The podiatric medical services provided by WFAI, through its physicians, include the prescription of corrective devices known as "orthotics," which address and treat certain maladies or conditions of the foot.

40.     As explained by WFAI's website:

> Orthotics are custom-made shoe inserts prescribed by your doctor at [WFAI] to establish or restore control to re-create normal foot function while relieving the associated pain.

(http://ww.weil4feet.com/about-us/our-services/custom-molded-orthotics)

41.     The orthotics prescribed by WFAI's podiatric physicians are "made to order" for each individual foot for which they are prescribed, using a specific and detailed examination and actual physical findings made for each individual patient.

42.     The examination findings used to prescribe a custom fit orthotic include first ray position, general foot motion, foot appearance (weight bearing and non-weight bearing), ankle dorsiflexion, subtalar joint motion, hallux dorsiflexion, limb length differences, knee position, gait pattern, forefoot varus or valgus, and tibial varus.

**The Dr. Scholl's Brand**

43.     Dr. Scholl's is a foot care brand, originally started by Dr. William Mathias Scholl in 1906, in Chicago, Illinois.

44.     After William Scholl died in 1968, Schering-Plough Corporation bought the Dr. Scholl's brand.

45.     The Dr. Scholl's brand has, for decades, been a prominent, if not dominant, leader in the over-the-counter shoe insert market in the United States.

46.     On November 4, 2009 Merck & Co. merged with Schering-Plough with the new company taking the name of Merck & Co. On information and belief, since 2009 Merck & Co. through its subsidiary Merck Consumer Care, Inc., manufactured, advertised, marketed promoted, sold and distributed Dr. Scholl's "Custom Fit Orthotics."

47.     In or about October 2014, Bayer AG completed the acquisition of the "consumer care" business of Merck & Co. On information and belief, Bayer AG completed the acquisition of Merck's "consumer care" business through acquiring all of stock of MSD Consumer Care, Inc. The acquisition included the Dr. Scholl's brand and products. On information and belief, the Dr. Scholl's product line is maintained and operated in the United States by Bayer AG through its Bayer HealthCare, LLC and Bayer Consumer Care, LLC subsidiaries.

48.     The Dr. Scholl's website specifically asserts that the makers of Dr. Scholl's products "advance the science of foot care."

(http://www.drscholls.com/common/about-scholls.aspx)

49.     Defendants, in their development and marketing of Dr. Scholl's Custom Fit Orthotics, know of the significance of the words and claims used to describe their products and the medical and/or scientific meanings of those words.

50.     Defendants expended substantial time, effort and resources developing the name, description and claims of the product that became Dr. Scholl's Custom Fit

Orthotics, which name and claims were determined through an exhaustive process of market research and analysis.

51.     Using the term "custom fit orthotic" in the advertising and sale of the Product is material to customers because it conveys medical legitimacy that defendants' Product does not have. Claims on its packaging and advertising that the Product was "tested by podiatrists" adds another term intended to add legitimacy to the claims which in turn is intended to persuade consumers to make a connection between the Dr. Scholl's product and licensed podiatrists.

### MEANING OF THE TERM "CUSTOM FIT ORTHOTIC"

52.     Each year, millions of Americans, including primarily elderly Americans, purchase products aimed to alleviate or cure ailments or discomforts pertaining to the foot.

53.     Certain of these products are known in the medical community and by the general consuming public as "orthotics" or "orthotic devices."

54.     Merriam-Webster defines "orthotics" as "a branch of mechanical and medical science that deals with the design and fitting of orthotics." Merriam Webster Dictionary (2015).

55.      An "orthotic" is defined as "a device (such as a brace or splint) for supporting, immobilizing, or treating muscles, joints, or skeletal parts which are weak, ineffective, deformed, or injured."

56.     As explained by the American Podiatric Medical Association ("APMA"):

*What are Prescription Custom Orthotics?*

Custom orthotics are specially-made devices designed to support and comfort *your* feet. Prescription orthotics are crafted for you and no one else. They match the contours of your feet precisely and are designed for the way you move. Orthotics are only manufactured after a podiatrist has conducted a complete evaluation of your feet, ankles, and legs, so the orthotic can accommodate your unique foot structure and pathology.

(http://www.apma.org/Learn/FootHealth.cfm?ItemNumber=988).

57.     In Illinois, the practice of prescribing "orthotics" is governed by statute the

Orthotics, Prosthetics, and Pedorthics Practice Act (the "Act") (225 ILCS 84/1 et seq),

which includes licensure requirements for individuals who provide such devices.

58.     The Illinois legislature has articulated the policy behind its statutory

mandate:

§ 5. Declaration of public policy.

*            *            *            *

The increasing population of elderly and physically challenged individuals who need orthotic, prosthetic, and pedorthic services requires that the orthotic, prosthetic, and pedorthic professions be regulated to ensure the provision of high-quality services and devices. The people of Illinois deserve the best care available, and will benefit from the assurance of initial and ongoing professional competence of the orthotists, prosthetists, and pedorthists practicing in this State. The practice of orthotics, prosthetics, and pedorthics serves to improve and enhance the lives of individuals with disabilities by enabling them to resume productive lives following serious illness, injury, or trauma. Unregulated dispensing of orthotic, prosthetic, and pedorthic care does not adequately meet the needs or serve the interests of the public. In keeping with State requirements imposed on similar health disciplines, licensure of the orthotic, prosthetic, and pedorthic professions will help ensure the health and safety of consumers, as well as maximize their functional abilities and productivity levels.

225 ILCS 84/5.

59. The Act defines an "orthosis" as "a custom-fabricated or custom-fitted brace or support designed to provide for alignment, correction, or prevention of neuromuscular or musculoskeletal dysfunction, disease, injury, or deformity." 225 ILCS 84/10.

60. The Act further defines "Orthotics" as:

[T]he science and practice of evaluating, measuring, designing, fabricating, assembling, fitting, adjusting, or servicing an orthosis under an order from a licensed physician or podiatric physician for the correction or alleviation of neuromuscular or musculoskeletal dysfunction, disease, injury, or deformity.

*Id.*

61. Under Illinois law, no person may evaluate, measure, design, fabricate, assemble, fit, adjust, or service an orthosis, unless the orthosis is "under an order from a licensed physician or podiatric physician" and the individual undertaking any of these activities is properly licensed under the Act.

62. As the APMA explains:

Orthotics are only manufactured after a podiatrist has conducted a complete evaluation of your feet and ankles. A podiatrist will examine your feet and how you walk; he or she will carefully listen to your complaints and concerns and assess the movement and function of your lower extremities. Some also use advanced technology to see how your feet function when walking or running. The information gathered during the exam will help your podiatrist determine if shoe inserts might be helpful or if you need prescription orthotics. If orthotics are needed, your podiatrist will capture a three-dimensional image of each of your feet. That image, as well as any measurements obtained by your podiatrist, is used to create a set of unique foot supports that will improve your foot movement and lead to more comfort and mobility.

Only a prescription orthotic can accommodate your unique foot structure.

http://www.apma.org/files/ProductPDFs/APMA%20prescription%20orthotics_forprint.pdf

63.     The term "custom," when used as an adjective is defined as "made or performed according to personal order." Merriam Webster Dictionary (2015)

64.     Similarly, the word "customize," when used as a transitive verb, is defined as "to build, fit, or alter according to individual specifications." *Id.*

65.     The term "custom made," used as an adjective, means "made to fit the needs or requirements of a particular person." *Id.*

66.     The Act defines a "custom fitted devices":

> [A]n orthosis, prosthesis, or pedorthic device made to patient measurements sized or modified for use by the patient in accordance with a prescription and which requires clinical and technical judgment and substantive alteration in its design.

225 ILCS 84/10.

67.     No person is identical to another person and neither are their feet. A prefabricated shoe insert, not made under a prescription based on the actual examination, evaluation and assessment of an individual and his or her feet, is not a "custom fit orthotic" under the plain and ordinarily understood meaning of these words.

68.     A prefabricated insert is, per se, not "custom fit" to any individual foot.

69.     A prefabricated insert which is not custom fit to an individual's foot under podiatrist's prescription based on a medical assessment is not, by definition, a "custom fit orthotic."

70.     Explaining these critical distinctions, the APMA explains:

> Shoe inserts are any kind of non-prescription foot support designed to be worn inside a shoe. Pre-packaged arch supports are shoe inserts. So are the "custom-made" insoles and foot supports that you can order online or at retail stores. Unless the device has been prescribed by a doctor and crafted for your specific foot, it's a shoe insert, not a custom orthotic device—despite what the ads might say.

(http://www.apma.org/files/ProductPDFs/APMA%20prescription%20orthotics_forprint.pdf)

**DEFENDANTS' FALSE ADVERTISING OF THE PRODUCT**

71.     Beginning in or about 2009, defendants began a campaign to sell "Custom Fit Orthotics."

72.     The Product is marketed and sold using certain "Foot Mapping Centers" whereby measurements are taken at a Foot Mapping Kiosk in retail stores and other locations where the Product is sold.

73.     Photographs of a "Foot Mapping" kiosk, that includes the description "Custom Fit Orthotic Center." and claims "**SAVE** vs Other Custom Fit Inserts," are shown below.





74.     As explained on Dr. Scholl's website:

The Dr. Scholl's Custom Fit Kiosk uses Foot Mapping technology to gather different measurements of your feet and recommend the Custom Fit Orthotic Inserts that are right for you.

**How does it work?**

It uses 2,000 pressure sensors to create your unique Foot Map

**What does it measure?**

Your arch type, foot length and pressure points

**Why should I try it?**

It's easy to use and only takes a few minutes.

16

75.     The Dr. Scholl's pressure plate "Foot Mapping" technology provides little more than a measurement of foot length and width, and an imprecise assessment of foot posture using an arch index measurement. Determining an individual's arch index using the Dr. Scholl's "Foot Mapping" process is inconsistent with different kiosks providing different results for the same person. Results may be skewed by the individual's weight and stance on the "foot mapping" kiosk. Also, although an individual's arch index may be one of many factors that could be considered in prescribing an effective orthotic device, relying on this one factor lone is insufficient to properly assess and prescribe a custom fit orthotic.

76.     Defendants have consistently advertised the Product as a "custom fit orthotic," which it is not. There are only 14 "pairs" of inserts available for purchase at the kiosks. Each are allegedly "custom fit" for the innumerable different consumers using the "mapping technology." Regardless of the actual condition of a consumer's feet, the "Foot Mapping" technology always recommends that one of the 14 pairs of "custom fit" inserts be purchased at a cost of $50 or more.

77.     Defendants' literally false advertising of the  Product has included the labeling on the outside of the box for the Product found on store shelves, television commercials, internet advertising and point-of-purchase and retail-level advertisements. In recent network television advertisements, and on the Dr. Scholl's website, defendant Bayer also makes the false medical claim that "Dr. Scholl's custom fit orthotic inserts are uniquely designed to provide immediate all day relief from lower back pain."

78.     An image of the product packaging label, that includes the descriptions

"Custom Fit Orthotics," "Customized Comfort and Support for Your Feet," and "Tested by Podiatrists" is shown below:



79. The Product packaging clearly and unambiguously communicates that the inserts are "Custom Fit Orthotic" products.

80. The main image on the packaging which contains the designations "Custom Fit Orthotic Inserts" is additionally displayed on the Foot Mapping® Kiosks where the Product is sold, in its television commercials for the product (one of which is available on the Dr. Scholl's website), and on the website itself.

81. In addition, a video of a previously aired television commercial, the website includes multiple videos, including one such video containing testimonials from three

representatives of the "Research and Development Department" which discuss the nature, mechanics, and benefits of the Product and the Foot Mapping Kiosks.

82.     The literal communication of the foregoing marketing, packaging and promotion of the product is that the Product is a "custom fit orthotic" product, which it is not.

### THE LITERALLY FALSITY AND MISLEADING NATURE OF DEFENDANTS' ADVERTISEMENT THE PRODUCT

83.     Dr. Scholl's Custom Fit Orthotic Inserts are neither "custom fit" nor are they "orthotics" as defendants falsely represent.

84.     Dr. Scholl's Custom Fit Orthotic Inserts are not "custom fit orthotic" products for the following reasons, which are non-exhaustive:

a)      The Product is not created or recommended based on examination and the measurements of an individual's foot by a licensed professional;

b)      Dr. Scholl's Custom Fit Orthotic Inserts are "prefabricated" and therefore are not, by definition, "custom fit" or otherwise "customized" to any individual's foot;

c)       On the contrary, each Dr. Scholl's Custom Fit Orthotic Insert is ascribed a general "size" and arch support stiffness which encompasses a small range of measurements into which an individual's foot is categorized as determined by the Foot Mapping Kiosk;

d)      the Product is not provided to an individual under a podiatrist's prescription for that particular individual;

e) the Foot Mapping Kiosk simply measure length and width of the foot and the individual's weight to arrive a rudimentary Arch Index. The Arch Index leads the machine to recommend an insert with a small range of stiffness; and

f) the Product does not function as a corrective orthotic.

85. If not literally false, these statements are deceptive and likely to mislead or confuse customers.

## CLASS ACTION ALLEGATIONS

86. Plaintiffs brings this action on their behalf and as the representatives of the following class:

> All podiatrists licensed to prescribe and sell custom fit orthotics in the United States.

87. Each of the putative class members has been affected by the defendants' misconduct in identical ways.

88. The class is so numerous and the members of the class are so dispersed geographically that their joinder is impracticable.

89. There are questions of fact and law common to the class which predominate over questions affecting individual class members.

90. These predominating questions include, but are not limited to:

a) whether defendants have made a false statement or statements of fact in a commercial advertisement about their own products;

b) whether defendants' false and misleading statements constitute false advertising in violation of Section 43(a) of the Lanham Act, 15 USC §

1125(a);

c) whether defendants' false and misleading statements of fact concerning the characteristics, performance and efficacy of the Product are material, and have and are likely to continue to influence consumers' purchasing decisions;

d) whether defendants' Product competes directly with plaintiffs' and the class members' products in the relevant market; and

e) Whether defendants' actions were willful.

91. The claims made by plaintiffs are typical of the claims of the class in that the Lanham Act and common law violations apply equally to and in the same respect to each class member, and defendants are alleged to have violated and injured the plaintiffs and each member of the class in the identical way.

92. Plaintiffs will fairly and adequately represent and protect the interests of the members of the class. Plaintiffs have no conflicts which would impair their ability to represent the class, and they have retained competent and experienced counsel to prosecute their claims.

93. Maintenance of a class action is an appropriate method for the fair and efficient adjudication of all claims arising out of defendants' conduct.

## COUNT I
### Violation of Section 43 of the Lanham Act

94. Plaintiffs incorporate paragraphs 1 through 93 above as paragraph 94 of this Count I.

95.     Defendants have engaged in willful deception specifically intended to confuse and deceive consumers, by describing its Product as a "Custom Fit Orthotic" in its advertising, marketing and promotional materials, website, packaging and point-of sale promotions, when it knew that the Product was nothing more than a generic, prefabricated, mass produced, over-the-counter shoe insert that is not custom fit to a consumer's unique physical characteristics.

96.     Defendants developed and have detailed knowledge regarding how consumers rely on certain sales and marketing strategies and intentionally set out and continue to utilize a sales and marketing strategy that purposefully mislead consumers in order to sell what is essentially a $10 retail product for $50 or more by claiming that the $50 item is a "Custom Fit Orthotic."

97.     Defendants intentionally set out to deceive consumers and its conduct, which is directed primarily at elderly consumers, is of such an egregious nature that a presumption arises that consumers have been deceived and mislead.

98.     Defendants' claim that the Product is a "Custom Fit Orthotic" is literally false. Even if the claim were literally true, the statement that the Product is a "Custom Fit Orthotic" is deceptive and likely to mislead or confuse customers and injury to consumers should be presumed.

99.     Plaintiffs and the class have suffered an economic and reputational injury flowing directly from the defendants' deceptive conduct.  This injury involves both the direct diversion of sales and a lessening of the goodwill associated with the services plaintiff and the class provide by misleading consumers to believe that custom fit

orthotics similar to the products the plaintiffs and the class prescribe may be obtained relatively inexpensively at a Dr. Scholl's "Custom Fit Orthotic" kiosk in any Walgreens, CVS, Walmart, or other locations where these kiosks may be found.

100.    Defendants' false and misleading statements constitute false advertising in violation of Section 43(a) of the Lanham Act, 15 USC § 1125(a).

101.    Defendants' false and misleading statements concern the nature, characteristics, and qualities of custom fit orthotics.

102.    Damages, in the form of defendants' gross profits on the sales of the Product, are warranted under 15 USC §1117(a) because defendants' conduct involved actual falsity and willful deception. An award of defendants' profits is also appropriate in the interest of deterrence.

103.    Because defendants knew that their marketing and advertising strategy would likely deceive the public, this an exceptional case within the meaning of 15 USC §1117 warranting three times actual damages, prejudgment interest and an award of attorneys' fees.

104.    Defendants' false and misleading advertising has caused and continues to cause irreparable injury to plaintiffs' and the class members' business, goodwill and reputation, and plaintiffs and the class members have no adequate remedy at law to prevent such injury from continuing.

105.    Injunctive relief to prevent further harm to plaintiffs and the class, including a corrective advertising campaign to explain the difference between actual

custom fit orthotics and defendants' Product, is warranted.

## COUNT II
## Unfair Competition

106.     Plaintiffs incorporate paragraph 1 through 105 above as paragraph 106 of this Count II.

107.     Defendants' false advertising of the Product is likely to cause confusion, deception, and mistake by creating the false and misleading impression that the Product constitute custom fit orthotics that are similar to the custom fit orthotics that plaintiffs and the class members prescribe and supply.

108.     Because of defendants' misleading and confusing conduct, plaintiffs and the members of the class have suffered and continue to suffer pecuniary damages and irreparable injury to their business, reputation, and goodwill.

WHEREFORE, plaintiffs and the class members pray that this Court enter judgment in favor their favor and against the defendants and award:

(A)     damages measured by defendants' profits on the sale of Dr. Scholl's Custom Fit Orthotic inserts;

(B)     three times the damage award;

(C)     prejudgment interest;

(D)     reasonable attorneys' fees, and

(E)     the costs of this action.

Plaintiffs and the class members additionally seek the entry of preliminary and permanent injunctive relief:

24

(A)    precluding defendants from continuing to market, advertise or sell their shoe inserts as "Custom Fit Orthotic" inserts; and

(B)    requiring defendants to undertake a corrective advertising campaign making a full disclosure as to the true nature of the products identified as Dr. Scholl's Custom Fit Orthotics and explaining the difference between their products and actual custom fit orthotics provided by plaintiffs and the members of the class.

Plaintiffs Demand Trial By Jury

**Lowell Scott Weil, DPM, and Weil Foot and Ankle Professional Services, LLC on behalf of themselves and all others similarly situated,**

By: /s/ Michael H. Moirano
One of their attorneys

Michael H. Moirano
Claire Gorman Kenny
Stephen A. Gorman
**Moirano Gorman Kenny, LLC**
135 S. LaSalle St., Suite 3025
Chicago, Illinois 60603
(312) 614-1260

Steven M. Levin
Margaret P. Battersby
Cari F. Silverman
**Levin & Perconti**
325 North LaSalle Street, Suite 450
Chicago, Illinois 60601
(312) 332-2872

William T. McGrath
**Davis McGrath, LLC**
125 S Wacker Dr., Suite 1700

25

Chicago, IL 60606
(312) 332-3033